In the Matter of the Claim of MARION K. GRAHAM, Respondent, against NASSAU & SUFFOLK LIGHTING COMPANY et al., Appellants.

WORKMEN'S COMPENSATION BOARD, Respondent.

Third Department, December 22, 1953.

**229**

*Robert N. Van Benthuysen* and *John J. Duggan* for appellants.

*Nathaniel L. Goldstein Attorney-General* (*Roy Wiedersum* and *Gilbert M. Landy* of counsel), for Workmen's Compensation Board, respondent.

*Walter Forster* for claimant-respondent.

IMRIE, J. Decedent was a gas maker in charge of a gas making machine at the Hempstead, New York, plant of employer, Nassau & Suffolk Lighting Company. On October 2, 1948, he was burned to death in the superheater of the machine. The Workmen's Compensation Board has found the death accidental awarding benefits therefor to his widow and four minor children. Employer and its insurance carrier have appealed to this court, contending that the death was the result of suicide rather than accident.

Decedent's sphere of activity was the so-called operating floor. The machine's generator, carburetor and superheater base were on the floor below. The superheater extended some sixteen feet nine inches above the operating floor. A steel ladder on that floor led to a platform four feet three inches from the seat of the clapper lid on the top of the heater stack. During the machine's operation the clapper opened automatically on a time cycle of four minutes. With such opening flames spread around its top and burned gases reaching temperatures as high as one thousand degrees passed upward through the roof by way of a funnel flue. The distance from the platform at the top of the ladder to the clapper seat, measured along the cylindrical side of the stack and over its slope to the stack opening, was approximately fifty-four inches. It is evident that, if a man of decedent's height, six feet one inch, stood on that platform and leaned over the top of the superheater, only nineteen inches of his total height would be above the aperture of the stack.

While in operation the machine was refueled at intervals. The refueling consisted of dumping 3,000 pounds of coke into the generator through an opening in the operating floor. The process of refueling consumed about four minutes. For that purpose the machine was "shut down" by the operating of a control located in the corner of the room about thirty-three feet from the superheater. The clapper lid opened automatically in the manner and with the result already described.

The only eye witnesses to the events leading to decedent's death were his two helpers, whose testimony is uncontroverted. At two-thirty o'clock in the afternoon one of these men, Harris, reminded decedent Graham that it was time to coal up. Decedent Graham instructed Harris to shut down the machine for that purpose. Harris went to the control, turning his back to decedent in so doing. When he had operated the control, he turned and saw two legs disappearing into the upper part of the heater. Carnabucci, the other helper, heard Graham's order to Harris. As he turned to pick up his gloves from a cart (presumably the coke cart), he saw decedent run to the steel ladder. When he turned back, he, too, saw legs going down the heater stack. The charred remains of decedent were later taken from the bottom of the heater. Carnabucci testified that Graham ran up the steps of the ladder pretty fast. The clapper lid was opening when Graham started to run for the ladder and flames were coming out of the stack.

Subdivisions 1 and 3 of section 21 of the Workmen's Compensation Law provide that it shall be presumed, in the absence

of substantial evidence to the contrary, that " the claim comes within the provision of this chapter " and that " the injury was not occasioned by the willful intention of the injured employee to bring about the injury or death of himself or of another." Claimant relies upon the testimony of one McKane in support of those presumptions. In its memorandum decision the board found McKane's testimony to be one of the several elements consistent with death by accident of sufficient strength to hold that the presumptions were not rebutted. McKane had been a gas maker with the employer until 1941, later listed as a second-class mechanic. He testified that he had worked on the same machine. He described his method of adjusting and cleaning the clapper by the use of an iron bar and scraper usually left on the platform. The bar was designed to fit into holes in the clapper rim. In using it to adjust the clapper he stated that he placed his feet on the cross bars of the platform railing so that he was standing two feet above the platform floor. He expressed the opinion that one attempting to adjust the clapper while standing in the described manner could fall into the stack if he slipped or were not careful. One of the exhibits illustrates McKane standing on the platform floor holding the bar inserted in one of the holes of the clapper rim. His position is indicative of greater leverage possibilities than would seem to exist if he were balanced on the cross bars of the railing.

His expression of opinion as to the possibility of falling into the stack was speculative and conclusory. It lacked probative value from which the statutory presumptions could derive substance. When he was attempting to explain his theory, the original hearing referee said, " I still don't see where he would go into the stack. * * * I don't see how he could fall into it. It doesn't appear that he could fall into the stack, but after all that is what I have to find out." Moreover, the opinion applied only to McKane's stated method of procedure, while there was no proof that Graham followed such practice. Any application of his theory to the instant case is further weakened by his explanation that such adjustment would be made when the machine was completely turned off.

We do not overlook the force or the importance of the stated presumptions. Nonetheless, they are limited presumptions which operate in the absence of substantial proof to the contrary. They are not substitutes for actual proof. Where there is no evidence at all of accidental injury (as is the situation here), the lack of such evidence may not be supplied by the presumption. " In other words, section 21 may not be availed

of, or the presumption utilized, to establish the incident of accident itself.'' (*Matter of McCormack* v. *National City Bank*, 303 N. Y. 5, 11; *Matter of Wilson* v. *General Motors Corp.*, 298 N. Y. 468, 472.) In the face of substantial evidence to the contrary, the presumptions fail and the burden falls back on the claimant. (*Matter of Magna* v. *Hegeman Harris Co.*, 258 N. Y. 82, 84.)

There was here such '' substantial evidence to the contrary.'' The physical measurements of the stack above the ladder platform, coupled with decedent's height and the reasonable application of elementary principles of physics, were sufficient to rule out the possibility of an accident. The chief medical examiner of Nassau County, testifying as to the investigation from which resulted his opinion and certification of death by suicide, said, '' It was purely on the measurements that we were able to base our opinion that it was not an accidental death, measurements and coupled with the principle of the fulcrum, leverage of a mass against a fixed point, the mass being the body and the fixed point being the railing.'' There was shown no duty or normal occasion calling for decedent's going up the ladder at the time. No emergency was suggested. Harris and Carnabucci both testified to the proper operation of the machine on that day. The employer's manual of rules for gas makers required them to report '' to the Shift Foreman any unusual conditions or failure in any part of the gas machines to operate normally.'' Harris had never seen anyone go to the top of the superheater while it was in operation. Replying to a question by the referee, Carnabucci said that decedent had nothing to do up there or any reason to go up the ladder. McKane said that the adjustment of the clapper was made when everything was turned off; that he had seen men climb the ladder under that circumstance. Concerning the possibility of one leaning over the top of the stack while the machine was in operation, though shut down for fueling, employer's engineer stated that the escaping gases would be in the neighborhood of one thousand degrees and that, in the interest of self-preservation, a man would not put himself in that position.

The board has found an absence of proof of suicidal tendencies and claimant has emphasized decedent's normally cheerful and optimistic disposition, which must direct our attention to evidence concerning him on the fatal day. His demeanor then impressed his coworkers as being different in that he was less talkative and was moody. Harris said, '' Therefore I didn't bother him.'' At two o'clock he had operated the control for

the refueling shutdown. Before he started up the ladder, he directed Harris to shut down the machine. It could be inferred that he was concerned because his wife had obtained an interlocutory decree of divorce, soon to become final, calling for somewhat substantial provisions for support of his family.

Tragic as was the event and unfortunate as are its consequences the record compels the conclusion that there was evidence sufficiently substantial to rebut the statutory presumptions and that suicide is the only reasonable inference to be drawn therefrom.

The decisions and awards should be reversed and the claim dismissed, with costs to appellants against Workmen's Compensation Board.

BERGAN, COON and HALPERN, JJ., concur; FOSTER, P. J., dissents.

Decisions and awards reversed and claim dismissed, with costs to appellants against Workmen's Compensation Board.